**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————————————

**DEBORAH SYLVESTER, et al.,**

                          Plaintiffs,

          - against –

**THE CITY OF NEW YORK, et al.,**

                          Defendants.
————————————————————————————————


**03 Civ. 8760 (JGK)**

**OPINION & ORDER**


**JOHN G. KOELTL, District Judge:**

     This action arises out of the fatal shooting of Melvin

Sylvester by defendant Detective Terrence Donnelly.  The

deceased's wife, Deborah Sylvester, on behalf of herself and

the estate of Melvin Sylvester, together with two of Melvin

Sylvester's children, William and Kimberly Sylvester, brought

this action against the City of New York (the "City") and

seven police officers and officials, asserting claims of

assault and battery, intentional infliction of emotional

distress, negligent infliction of emotional distress, and

false imprisonment, among others.  The defendants have now

moved for partial summary judgment.

# I.

## A.

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224. The moving party bears the initial burden of informing the district court of the basis for its motion and identifying the matter that it believes demonstrates the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly

preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Consol. Edison, Inc. v. Northeast Utilities, 332 F. Supp. 2d 639, 642 (S.D.N.Y. 2004).

Summary judgment is appropriate if it appears that the non-moving party cannot prove an element that is essential to the non-moving party's case and on which it will bear the burden of proof at trial. See Cleveland v. Policy Mgt. Sys. Corp., 526 U.S. 795, 805-06 (1999); Celotex, 477 U.S. at 322; Powell v. Nat. Bd. of Med. Exam'rs, 364 F.3d 79, 84 (2d Cir. 2004). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Gallo, 22 F.3d at 1223. Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party. See Chambers v. T.R.M. Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). If the moving party meets its initial burden of showing a lack of a material issue of fact, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The

nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible." Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998); Singh v. New York City Off-Track Betting Corp., No. 03 Civ. 5238, 2005 WL 1354038, at *1 (S.D.N.Y. June 8, 2005) (slip opinion); Consol. Edison, 332 F. Supp. 2d at 643.

## B.

Unless otherwise noted, the following facts are not disputed. On August 8, 2003, after midnight, defendant Detective Terrence Donnelly, a New York City Police Department ("NYPD") detective dressed in plain clothes, approached a crowd that had gathered outside the entrance of 200 West 131st Street in Manhattan. (Defs.' Local Rule 56.1 Stmt. ("Defs.' Stmt."), ¶ 7; Pls.' Resp. to Defs.' Local Rule 56.1 Stmt. ("Pls.' Stmt."), ¶¶ 7, 48; Deposition of Detective Terrence Donnelly, dated July 22, 2004 ("Donnelly Dep."), at 45, attached as Ex. F to Rossan Decl.) At the time, Donnelly was not wearing corrective lenses prescribed to him to correct astigmatism in one eye. (Donnelly Dep. at 11-12, 45.) Donnelly testifies that he heard people say "They are fighting, they have guns across the street." (Id. at 69-70.)

After reaching the crowd, Donnelly allegedly raised his gun
and pointed it at William Sylvester, who placed his hands in
the air over his head.  (Id. at 129-30.)  Donnelly testified
that he feared William Sylvester was going to shoot a woman
(id. at 127), but the plaintiffs counter that Donnelly never
observed a weapon in William's hands or on his person (Pls.'
Stmt. at 53; Donnelly Dep. at 136, 266).  A few moments later,
Melvin Sylvester, William's father, approached the area where
Donnelly and William were.  (Police Report, attached as Ex. 6
to Aff. of Edward Sivin, dated Feb. 22, 2005 ("Sivin Aff.").)

The parties differ with respect to the circumstances of
Donnelly's shooting of Melvin Sylvester.  The plaintiffs
allege that Donnelly shot Melvin even though Melvin did not
advance toward Donnelly and Donnelly did not observe an open
knife in Melvin's hands.  (Pls.' Stmt. at 56-57; Donnelly Dep.
at 157; Deposition of Kimberly Sylvester, dated Sept. 20, 2004
("Kimberly Dep."), at 122, 129-30, attached as Ex. 2 to Sivin
Aff.)  They also allege that after the shooting, Donnelly
never observed an open knife either on Melvin's person or near
his body (Pls.' Stmt. at 58; but see Donnelly Dep. at 169-73).

The defendants allege that while Donnelly was pointing
his gun at William, Melvin came at Donnelly from behind
wielding a knife.  (See, e.g., Donnelly Dep. at 136.)  Hearing

a noise behind him, Donnelly spun around, shouted warnings that he was a police officer and that Melvin should stop, observed a knife in Melvin's hand, and then shot Melvin in the chest after Melvin failed to stop. (Id. at 146-74.)  The defendants also deny plaintiffs' allegations that Donnelly ever pointed his gun at Kimberly. (Kimberly Dep. at 293.)

Although no weapon was found on William, he was handcuffed and taken by defendants officers James Quilty and Matthew Campbell to the 32nd police precinct. (Donnelly Dep. at 266-67; Deposition of James Quilty, dated Aug. 9, 2004 ("Quilty Dep."), at 78-85, attached as Ex. N to Rossan Decl.; Deposition of Matthew Campbell, dated Aug. 10, 2004 ("Campbell Dep."), at 70-73.)  William's sister Kimberly was taken to the 32nd police precinct by defendant Thaddeus Hall. (Deposition of Thaddeus Hall, dated Aug. 11, 2004 ("Hall Dep."), at 23, attached as Ex. M to Rossan Decl.)  Deborah Sylvester, Melvin's wife was also taken to the 32nd police precinct, although she had buckled at the scene after learning that her husband had been shot. (Deposition of Deborah Sylvester, dated Sept. 14, 2004 ("Deborah Dep."), at 156-61, attached as Ex. 1 to Sivin Aff. and Ex. K to Rossan Decl.)  Neither of the three were ever charged with any crime, violation, or other offense in connection with the shooting and other events of August 8, 2003.  (Id. at 177; Kimberly Dep. at 293, 299;

Deposition of William Sylvester, dated Sept. 15, 2004 ("William Dep."), at 216, attached as Ex. 3 to Sivin Aff.)

William was questioned by Detective Chavers at the 32nd police precinct and Chavers wrote out a statement purporting to contain William's observations of the shooting; this statement includes the sentence: "My father had a little knife pocket knife in his hand." (Deposition of Detective Byron Chavers, dated Aug. 21, 2004 ("Chavers Dep."), at 69, attached as Ex. L to Rossan Decl.; Bates Nos. 379-81, attached as Ex. 6 to Sivin Aff.; but see William Dep. at 118.) Kimberly was questioned at the 32nd police precinct by Hall, who also wrote out a statement purporting to contain her observations; that statement includes the following sentence: "My father not knowing that they [were] cops pulled a pocketknife and the cop shot him." (Bates No. 638, attached as Ex. 6 to Sivin Aff.) In the recorded interview of Kimberly taken on the night of the incident, Kimberly said, "[My father] kind of came at him [Donnelly] to like stop him from shooting my brother, but I think he came at him, maybe with a pocket knife." (Ex. E to Rossan Decl. at 5.)

The parties disagree about the circumstances surrounding these questionings and the resulting statements. The plaintiffs contend that Kimberly's and William's statements were only given after officers told them that they could not

go to the hospital until they gave and agreed to the statements. (Pls.' Stmt. at 12; Kimberly Dep. at 267, 276-81; William Dep. 170-71, 184, 207, 210-12.) The plaintiffs also allege that Deborah was questioned at the 32nd police precinct by a detective, allegedly Chavers, even though she requested approximately six times that the questioning be stopped so that she could go to the hospital to be with her husband. (Deborah Dep. at 170; Chavers Dep. at 117; but see id. at 62-64.)

On the other hand, the defendants stress that Kimberly, in tape recorded statements from the night of the shooting, said that Melvin came at Donnelly with a pocket knife and that she was not coerced into making statements. (Kimberly Dep. at 279-81, 284; Ex. E to Rossan Decl. at 4-5, 8, 10.) The defendants also allege that, although detective Byron Chavers attempted to interview Deborah Sylvester, the interview was terminated upon her request to go to the hospital. (Chavers Dep. at 62-64.) Moreover, the defendants note that Deborah later said that she did not recall speaking with Chavers. (Deborah Dep. at 171-72.)

Donnelly later told police officials that his police shield was displayed around his neck when he shot Melvin, that Melvin brandished a knife before he shot him, and that Melvin continued to charge at him after he yelled, "Stop, police."

(Bates No. 2, attached as Ex. 6 to Sivin Aff.)  Moreover, Quilty allegedly told police officials that, while Kimberly was administering CPR to her dying father at the scene, she said: "The cop was right, he was coming at him with a knife." (Bates No. 199, attached as Ex. 6 to Sivin Aff.; Quilty Dep. at 58.)

The plaintiffs also argue that O'Looney, Deputy Commissioner for Public Information for the New York City Police Department, made inaccurate statements to the media when he said after the shootings: "We've taken statement from three on-scene witnesses who all say they see Melvin Sylvester coming at the officer from behind with the knife raised in a stabbing motion."  (Deposition of Michael O'Looney, dated Oct. 18, 2004 ("O'Looney Dep."), at 43-45, 53, attached as Ex. H to Rossan Decl.; Bates Nos. 298, 300-01, 303-04, attached as Ex. 6 to Sivin Aff.)  The plaintiffs allege that a civilian witness questioned by the police told investigators that Melvin was standing still and not holding anything in his hands when he was shot (O'Looney Dep. at 67-68), that only one non-family witness, Darlena Harding, allegedly said that Melvin came at Donnelly from behind with a knife trying to stab him (id. at 67; Bates Nos. 211-12, 690, attached as Ex. 6 to Sivin Aff.), and that, at the time, O'Looney had information that Harding might be biased (id. at Bates Nos.

211-12, 674, 688, 690).  The plaintiffs claim that Brian Burke, assigned to the Public Information office, made the following allegedly inaccurate statement: "It appeared the officer acted within guidelines."  (Deposition of Brian Burke, dated Nov. 17, 2004 ("Burke Dep."), at 14, 19, 23-24, attached as Ex. G to Rossan Decl.; Bates No. 299, attached as Ex. 6 to Sivin Aff.)  Burke's and O'Looney's statements were reported in multiple New York area newspapers.  (Id. at Bates Nos. 298-301, 303-04.)

Over the next few days, newspapers also quoted police sources as stating that Melvin had ten prior arrests, including an arrest in 2000 for menacing another with a knife.  (Id. at Bates Nos. 298-99, 303-04.)  The plaintiffs note that Melvin had not been arrested since 1989, that all but two of his arrests resulted in dismissals and sealed records, and that the police had knowledge of this.  (Id. at Bates Nos. 586, 679-84, 712-14, 721, 724; O'Looney Dep. at 33-34, 73, 76.)

The defendants counter that O'Looney and Burke both listened to Kimberly's recorded interview before making any statements to the media and that their statements were consistent with hers.  (Id. at 90; Burke Dep. at 21-24.) Moreover, they argue that Burke only responded to one media inquiry, which regarded whether the officers complied with

department guidelines, and that neither Burke nor O'Looney

disseminated any information to the media regarding Melvin's

criminal record or his alleged drinking prior to the shooting.

(Id. at 19-20, 26, 35; O'Looney Dep. at 90.)


## II.

In their Second Amended Complaint ("SAC"), filed on April

15, 2004, the plaintiffs allege twenty-nine causes of action

against the City of New York and seven named City of New

York/NYPD employees.  In response to the motion for partial

summary judgment, the plaintiffs agreed to dismiss all or part

of numerous claims.  The remaining claims are as follows:

first, the plaintiffs assert claims of assault and battery

(First Cause of Action) and violations of Melvin's rights

pursuant to 42 U.S.C. § 1983 (Second Cause of Action).[1]

---

[1] The defendants do not move for summary judgment dismissing the First, Second, Seventh, Eighth, and Twenty-Third Causes of Action.  In their Memorandum of Law in Partial Opposition to Defendants' Motion for Summary Judgment and in Further Support of Plaintiffs' Motion to File and Serve an Amended Summons and Complaint, the plaintiffs concede that they do not oppose the defendants' motion for summary judgment dismissing the Third, Fifth, Tenth, Thirteenth, Fourteenth, Seventeenth, Twentieth, Twenty-First, Twenty-Fifth, Twenty-Sixth, and Twenty-Ninth Causes of Action.  The plaintiffs also concede that they do not oppose the defendants' motion for summary judgment dismissing the parts of the Eleventh and Twelfth Causes of Action against Quilty, Campbell, and Chavers.  Accordingly, the Eleventh and Twelfth Causes of Action remain only against defendants the City of New York and Hall, and the defendants have not moved for summary judgment on those portions of the claim.  Likewise, the plaintiffs concede that they do not oppose the defendants' motion for summary judgment dismissing the parts of the Eighteenth and Nineteenth Causes of Action against defendant Hall.  Accordingly, the Eighteenth and Nineteenth Causes of Action remain only against defendants the City of New York, Quilty, Campbell, and Chavers.  However, because the plaintiffs' claims against the City in the Twelfth and Nineteenth Causes of Action can only be maintained as Monell claims and the plaintiffs are not pursuing such

Second, the plaintiffs assert claims on behalf of the Melvin's

estate against the City and Donnelly arising from Melvin's

death (Seventh and Eighth Causes of Action). Third, the

plaintiffs assert that Donnelly's actions prior to the

shooting and the shooting itself were acts of negligence

(Fourth Cause of Action). Fourth, the plaintiffs assert a

civil liability claim for the violation of New York Criminal

Procedure Law § 160.50 (Sixth Cause of Action). Fifth, the

plaintiffs assert claims of negligent infliction of emotional

distress ("NIED") to William and Kimberly based on "zone of

danger" theories (Ninth and Sixteenth Causes of Action).

Sixth, the plaintiffs assert claims of intentional infliction

of emotional distress ("IIED") to Kimberly, William, and

Deborah for the actions of the defendants subsequent to the

shooting (Fifteenth, Twenty-Second, Twenty-Seventh Causes of

Action). Seventh, the plaintiffs assert claims of false

imprisonment and violations of 42 U.S.C. § 1983 (Eleventh,

Twelfth, Eighteen, Nineteenth, Twenty-Third, and Twenty-Fourth

---

claims, the City is dismissed as a defendant on those claims. The
plaintiffs also concede that they do not oppose the defendants' motion for
summary judgment dismissing the parts of the Twenty-Fourth Cause of Action
against Quilty, Campbell, Hall, and the City of New York. Accordingly,
the Twenty-Fourth Cause of Action remains only against defendant Chavers.
The plaintiffs concede that they do not oppose the defendants' motion for
summary judgment dismissing the Twenty-Eighth Cause of Action to the
extent that the motion seeks the dismissal of any Monell claims, but
continue to oppose defendants' motion for summary judgment regarding
claims under 42 U.S.C. § 1983. The individual defendants oppose all of
the plaintiffs' causes of action against them on the grounds of qualified
immunity.

Causes of Action)[2].  Finally, the plaintiffs assert a claim

for the alleged cover up by the defendants of the shooting

(Twenty-Eighth Cause of Action).

     The plaintiffs also filed a motion to amend their SAC to

add Lieutenant Raymond Sanchez as a defendant.  (See Docket

Nos. 20-21.)  The plaintiffs later agreed not to pursue their

proposed causes of action alleging that Sanchez participated

in a racially-motivated conspiracy to cover up the facts of

the shooting, and Magistrate Judge Mass denied the remainder

of the plaintiffs' motion to amend their SAC.  (Docket No.

44.)  The plaintiffs filed no objections to that ruling.


                              III.

     The defendants move for summary judgment on the

plaintiffs' negligence claim against Donnelly and the City

(Fourth Cause of Action).  As an alternative cause of action

to assault and battery (First Cause of Action), the plaintiffs

claim that Donnelly, through a combination of inexperience,

panic, mistake, and poor eyesight, inadvertently fired his gun

at Melvin.

     The defendants contend that, under New York law, "once

intentional offensive contact has been established, the actor

---

[2] The plaintiffs do not oppose the defendants' motion for summary judgment
dismissing some of these claims against some of the defendants.  See supra
n.1.

is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently." Mazzaferro v. Albany Motel Enter., Inc., 515 N.Y.S.2d 631, 632-33 (App. Div. 1987) (internal citation omitted); Masters v. Becker, 254 N.Y.S.2d 633, 634-35 (App. Div. 1964). Federal cases have followed Mazzaferro. See, e.g., Busch v. City of New York, No. 00 CV 5211, 2003 WL 22171896, at *7 (E.D.N.Y. Sept. 11, 2003); Dineen v. Stramka, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002) (holding that "[w]hen a plaintiff asserts excessive force and assault claims which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie" (citing Mazurkiewicz v. New York City Tarnsit Auth., 810 F. Supp. 563, 570-71 (S.D.N.Y. 1993))). The defendants also argue, in this case, that there is no evidence of negligent conduct and that there is no dispute that Donnelly intended to shoot Melvin Sylvester and that he hit his intended target. Indeed, all of the defendants conceded at the argument of this motion that the shooting was intentional.

The plaintiffs argue that, under Federal Rule of Civil Procedure 8(e)(2), they can "'plead two or more statements of a claim, even within the same count, regardless of consistency.'" Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999) (internal citation omitted). They also identify some

cases where shootings by police officers proceeded under common-law negligence theories.  See, e.g., McCummings v. New York City Transit Auth., 613 N.E.2d 559 (N.Y. 1993) (affirming a verdict in favor of the plaintiff based on a theory of negligence against a police officer who shot the plaintiff); Blaize v. City of New York, 436 N.Y.S.2d 34, 35 (App. Div. 1981).  Accordingly, they argue that a reasonable jury could find that Donnelly was negligent and that they can plead both intentional assault and negligence.

Mazzaferro questioned the continuing validity of an earlier New York Court of Appeals decision, Flamer v. City of Yonkers, 127 N.E.2d 838 (N.Y. 1955), which held that a negligence claim could be asserted against a police officer even in the presence of an assault claim.  Mazzaferro pointed to more recent cases and the Restatement (Second) of Torts and noted that Flamer should be limited to conduct in the course of law enforcement activities by the police.  Mazzaferro, 515 N.Y.S.2d at 633.

While it is possible to have a negligent shooting claim against a police officer, see McCummings, 613 N.E.2d at 561, the summary judgment record in the case establishes that the shooting was intentional and not negligent.  In view of that intentional conduct, no reasonable juror could find that the conduct was negligent, and therefore, a claim for a negligent

shooting cannot be sustained in this case.  See Busch, 2003 WL
22171896 at *7; Dineen, 228 F. Supp. 2d at 454.  While the
plaintiffs attempt to assert that Donnelly may have carelessly
or negligently shot Melvin, there is no evidence for that
theory and Donnelly admits having intentionally shot Melvin.

The plaintiffs also argue that Donnelly created an
"unreasonable risk" that caused the shooting.  The plaintiffs
rely on Greggo v. City of Albany, 395 N.Y.S.2d 735, 737-38
(App. Div. 1977).  But in Greggo, the police officer created
the unreasonable risk by acting unreasonably towards a third
party who obtained a weapon from the police officer and shot
the plaintiff.  Greggo was not a case such as here where the
evidence shows without reasonable dispute that the police
officer intentionally shot the plaintiff.

Accordingly, the defendants' motion for summary judgment
dismissing the Fourth Cause of Action is granted.


**IV.**

The defendants move for summary judgment dismissing the
plaintiffs' claim that Melvin's reputation was injured as a
result of the defendants' alleged violation of New York
Criminal Procedure Law ("CPL") § 160.50 (Sixth Cause of
Action).  CPL § 160.50 provides that, upon termination of a
criminal proceeding in favor of the accused--and if the

interests of justice do not require otherwise--"the record of such action or proceeding shall be sealed." N.Y. CPL Law § 160.50. In their complaint, the plaintiffs argue that CPL § 160.50 was violated when Melvin's criminal record was allegedly disclosed to the press, and Melvin's reputation was injured. The defendants counter that (1) a claim of injury to reputation does not survive death, (2) the plaintiffs do not provide evidence and cannot establish that any defendant disseminated information about Melvin's criminal record, and (3) a violation of CPL § 160.50 does not give rise to civil liability.

CPL § 160.50 does not explicitly provide for a cause of action for damages if it is violated--and no case has provided for damages solely on the basis of an alleged violation of CPL § 160.50. Moreover, because, in other contexts, claims for harm to one's reputation do not survive death, even if there existed a civil cause of action under CPL § 160.50, it would not have survived Melvin's death. See, e.g., Meerpool v. Nizer, 381 F. Supp. 29, 35 n.3 (S.D.N.Y. 1974) (noting that in New York, even a descendant cannot bring an action for defamation of a deceased individual (citing Rose v. Daily Mirror, Inc., 31 N.E.2d 182 (N.Y. 1940))).

Although the plaintiffs never pleaded this cause of action under 42 U.S.C. § 1983 in their complaint, they cite in

their memorandum Anderson v. City of New York, where the court held that the plaintiff stated a cause of action under 42 U.S.C. § 1983 for the violation of a constitutionally protected liberty interest under CPL § 160.50. Anderson v. City of New York, 611 F. Supp. 481, 488-90, 494 (S.D.N.Y. 1985). In any event, even under § 1983, the plaintiffs' claim must be dismissed.

While Anderson did permit a § 1983 cause of action arising out of an alleged violation of CPL § 160.50, there is no basis to apply that decision here. First, there is reason to question the continuing vitality of Anderson. See Griffin v. Kelly, No. 92 Civ. 8623, 1994 WL 9670, at *4-5 (S.D.N.Y. Jan. 11, 1994) (assuming arguendo the continued vitality of Anderson but finding no constitutional violations in that case); Moore v. Dormin, 662 N.Y.S.2d 239, 243-44 (Sup. Ct. 1997) (finding no constitutional violation of CPL § 160.50). Judge Scheindlin has persuasively argued that the analysis in Andersen that found a constitutionally protected liberty interest in CPL § 160.50 has been undermined. As Judge Scheindlin explained:

> In reaching its decision, Anderson relied, in part,
> on Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74
> L.Ed.2d 675 (1983), which held that a state statute
> can create a constitutionally protected liberty
> interest if it contains 'language of an
> unmistakably mandatory character' such that the
> intrusion on one's liberty would not occur 'absent

specified substantive predicates.' _Id_. at 471-72,
103 S.Ct. at 871. Based on this standard, the
_Anderson_ court reasoned that a liberty interest was
created by the mandatory language of CPL § 160.50.
In _Sandin v. Conner_, 515 U.S. 472, ----, 115 S.Ct.
2293, 2300, 132 L.Ed.2d 418 (1995), however, the
Supreme Court abandoned the approach used in
_Hewitt_, finding that it 'strayed from the real
concerns undergirding the liberty protected by the
Due Process Clause.'

_Grandal v. City of New York_, 966 F.Supp. 197, 202 (S.D.N.Y.

1997).

In any event, the interests that the _Andersen_ court found

to be protected by CPL § 160.50 do not exist here.  In

_Andersen_, the court noted that the various interest protected

by the statute included an accused's right "in the pursuit of

employment, education, professional licensing and insurance

opportunities."  _Andersen_, 611 F. Supp. at 488 (internal

citation omitted).  Other courts have found no violation of

any liberty interest protected by CPL § 160.50 in the absence

of specific allegations of harm to reputation coupled with

specific harms to the accused's employment, education,

professional licensing and insurance opportunities.  _See,_

_e.g._, _Compton v. Middaugh_, No. 95 Civ. 552, 1998 WL 59451, at

*4-5 (N.D.N.Y. Feb. 9, 1998); _Grandal_, 966 F. Supp. at 202 and

n.7; _Griffin_, 1994 WL 9670 at *4.  In this case, there can be

no such allegation.  Melvin no longer has a protectable

interest in his reputation under New York State law that

survived his death.  Moreover, there are no allegations of any harm to other opportunities for Melvin that could be made in view of his death.

Therefore, the plaintiffs' Sixth Cause of Action is dismissed.

## V.

The defendants move for summary judgment dismissing the plaintiffs' claims for intentional infliction of emotional distress ("IIED").  These claims are asserted by Kimberly (Fifteenth Cause of Action) and by William (Twenty-Second Cause of Action) against the City, Donnelly, Burke, O'Looney, Quilty, Campbell, Chavers, and Hall.[3]  The plaintiffs argue that Campbell, Quilty, Chavers, and Hall prevented Kimberly and William from seeing Melvin after the shooting; that Chavers and Hall engaged in a course of conduct that was designed to elicit false statements from William and Kimberly; and that Donnelly, O'Looney, and Burke disseminated false information about Melvin.  The defendants move for summary judgment dismissing their claims against various defendants on various bases discussed below.

---

[3] The plaintiffs conceded at arguments that Deborah did not have a claim for IIED.  Accordingly, the defendants' motion for summary judgment on that claim is granted (Twenty-Seventh Cause of Action).

**A.**

In New York, "public policy prohibits recovery for claims of intentional infliction of emotional distress against the City . . . ." Hazan v. City of New York, No. 98 Civ. 1716, 1999 WL 493352, at *7 (S.D.N.Y. July 12, 1999) (citing Lauer v. City of New York, 659 N.Y.S.2d 57, 58 (App. Div. 1997), app. denied, 91 N.Y.2d 807 (N.Y. 1998); Wheeler v. New York, 479 N.Y.S.2d 244 (App. Div. 1984)).  The plaintiffs failed to respond to the defendants' argument based on this principle of New York law.  Accordingly, the defendants' motion for summary judgment dismissing the plaintiffs' IIED causes of action against the City is granted.

**B.**

To maintain a claim of IIED under New York law, the plaintiffs must establish "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." Bender v. City of New York, 78 F.3d 787, 790 (2d Cir. 1996) (citing Howell v. New York Post Co., 612 N.E.2d 699, 702 (N.Y. 1993)).  In Howell, the New York Court of Appeals noted that "the requirements of the rule are rigorous, and difficult to satisfy"; that "of the intentional infliction of emotional distress claims considered by [the New

York Court of Appeals], every one has failed because the alleged conduct was not sufficiently outrageous"; and that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Howell, 81 N.Y.2d at 122 (internal citation and quotation marks omitted).  However, in Bender, the Court of Appeals for the Second Circuit noted that "lower [New York] courts have sustained some emotional distress claims . . . that appear to allege conduct that is somewhat less than utterly intolerable in a civilized society."  Bender, 78 F.3d at 791 (citing Flatley v. Hartmann, 525 N.Y.S.2d 637, 638 (App. Div. 1988); Halio v. Lurie, 222 N.Y.S.2d 759, 764 (App. Div. 1961); Flamm v. Van Nierop, 291 N.Y.S.2d 189, 191 (Sup. Ct. 1968)) (internal citation and quotation marks omitted); but see Silberstein v. Advance Magazine Publishers, Inc., 988 F. Supp. 391, 394 (S.D.N.Y. 1997) (noting that Bender and the cases it cites "antedate the New York Court of Appeals' recent and pointed reminder that it never has sustained a claim for intentional infliction of emotional distress").

**1.**

The plaintiffs allege that statements by Donnelly, Burke, Quilty, and O'Looney are "outrageous" and "extreme" and sufficient to maintain a claim of IIED. Howell, 612 N.E.2d at 702. Some courts have allowed IIED causes of action to proceed for the making of false reports--the alleged conduct of Donnelly--and for plotting to make, and making of, false statements about the conduct of a plaintiff. See, e.g., Kurschus v. Painewebber, Inc., 16 F. Supp. 2d 386, 391, 395 (S.D.N.Y. 1998) (holding that the plaintiff's claim that the defendants plotted to accuse falsely the plaintiff of coercing sex from one of the defendants satisfied the first element of IIED). In other cases, however, mere false and outrageous statements were not enough to establish a claim of IIED. See, e.g., Harville v. Lowville Cent. Sch. Dist., 667 N.Y.S.2d 175, 176-77 (App. Div. 1997) (holding that the plaintiffs failed to state a cause of action for IIED where a teacher told the plaintiffs' child, Rebecca, "Boy you Polish Nazis are smart," and then added, "Becky's going to be mad at me for a week").

In this case, accepting the plaintiffs' allegations, the officers lied about the number of witnesses who said they saw Melvin coming at Donnelly from behind with a knife, about the fact that Donnelly had shouted to Melvin to stop because Donnelly was a police officer, and about the officers acting

within guidelines.[4]  However, none of these alleged statements were about the plaintiffs claiming IIED--Kimberly and William. Allegedly lying about the circumstances surrounding the plaintiffs' father does not rise to the level of the conduct in Kurschus where false statements about the plaintiff were allegedly made as part of a plot to accuse the plaintiff of a serious crime.  Kurschus, 16 F. Supp. 2d at 395.  Indeed, the plaintiffs fail to identify any case where false statements like the ones in this case--directed at the plaintiffs' family member, but not the plaintiffs--are on their own sufficient to maintain a claim of IIED.  Lacking statements directed at the plaintiffs, the facts in the record are unlike those of IIED cases based on false statements by the police.

Accordingly, the alleged false statements of Donnelly, O'Looney, Quilty, and Burke do not alone give rise to a claim of IIED by the plaintiffs Kimberly and William.


**2.**

The plaintiffs also allege that false statements by Quilty; the forcible bringing of William and Kimberly to the precinct by Quilty, Campbell, and Hall; the ignoring of

_____

[4] In their complaint, the plaintiffs also alleged that some of the defendants made false statements to the media that Melvin was drunk at the time of the incident; however, this allegation was not pursued in the plaintiffs' memorandum.  The plaintiffs also conceded at the argument of the motion that they were not pursuing this allegation.

William's and Kimberly's requests to go to the hospital by Quilty, Campbell, Hall, and Chavers; and the elicitation of false statements from William and Kimberly by Hall and Chavers are, when taken together, "outrageous" and "extreme" and sufficient to maintain a claim of IIED.[5] Murphy v. American Home Products Corp., 448 N.E.2d 86, 90 (N.Y. 1983).

In Bender, allegations that the plaintiff was falsely accused of wrongfully initiating an assault against an officer and was falsely accused of assault were sufficient to sustain a claim of IIED. Bender, 78 F.3d at 789, 791-92. Although, unlike Bender, the plaintiffs William and Kimberly were never charged with, or falsely accused of, criminal acts, the alleged conduct of some of the defendants against those two plaintiffs could be found by a reasonable jury to rise to the level of a claim of IIED. Indeed, a reasonable jury could find it "utterly intolerable in a civilized community" for police officers to detain innocent individuals, pressure them to give false statements, and ignore their requests to leave police

---

[5] At argument, the plaintiffs also argued that the shooting of Melvin by Donnelly gives rise to a claim of IIED, relying on Maney v. Maloney, 477 N.Y.S.2d 436, 438 (App. Div. 1984) (noting that a "cause of action, sounding in intentional tort, may be viable in cases where the defendant, by extreme and outrageous conduct, causes injury to a third person, thereby intentionally or recklessly causing severe emotional distress to a member of such person's family who is present at the time"). This was neither pleaded in the complaint nor argued in the plaintiffs' memorandum. Moreover, the plaintiffs never argued that Donnelly intentionally or recklessly caused harm to Kimberly or William. Without such intent, Kimberly's and William's causes of action for emotional distress against Donnelly can only proceed under a theory of negligence.

custody, all while a family member is dying in a nearby hospital. Bender, 78 F.3d at 791 (citations omitted). There is conflicting testimony as to the circumstances surrounding the above-described allegations and issues of fact as to whether William and Kimberly were forcibly brought to the 32nd police precinct, whether officers ignored their requests to leave, and whether officers elicited false statements. These questions, if resolved in the plaintiffs' favor, could be found to be "outrageous" and "extreme" by the fact finder.

Accordingly, the conduct of officers Chavers and Hall, who are alleged to have participated in the forcible detention, elicitation of statements, and ignoring of requests to leave, could be found to rise to such a level. On the other hand, the actions of officers Quilty and Campbell, because they were not involved in the alleged elicitation of false statements, do not rise to such a level.[6]

## C.

The defendants counter that, because the conduct complained of by the plaintiffs is encompassed in the plaintiffs' claims of false imprisonment, the IIED cause of action is redundant. The New York Court of Appeals has stated

---

[6] This is true for Quilty, even though he allegedly also made false statements. Those statements, combined with other allegations, are not enough to establish a claim of IIED as to that defendant.

that "[i]t may be questioned whether the doctrine of liability for intentional infliction of extreme emotional distress should be applicable where the conduct complained of falls well within the ambit of other traditional tort liability . . . ." Fischer v. Maloney, 373 N.E.2d 1215, 1217 (N.Y. 1978). This rule has been applied to bar claims of IIED in both New York State and federal courts. See, e.g., Druschke v. Banana Republic, 359 F. Supp. 2d 308, 315-16 (S.D.N.Y 2005); Herlihy v. Metro. Museum of Art, 633 N.Y.S.2d 106, 114 (App. Div. 1995). However, some courts have sustained IIED claims even where the conduct complained of fell under other traditional tort doctrines. See, e.g., Levine v. Gurney, 539 N.Y.S.2d 967, 968 (App. Div. 1989); Murphy v. Murphy, 486 N.Y.S.2d 457, 459 (App. Div. 1985); but see Bender, 78 F.3d at 792 (noting that the Court of Appeals for the Second Circuit is "uncertain whether the [New York] courts would entertain an emotional distress claim in addition to other torts" and that the unusual facts in Levine, where the police officer was involved with the victim's husband, make "that case a doubtful authority for inferring any generalized rule").

In this case, although there undoubtfully is overlap between William's and Kimberly's IIED claims and their false imprisonment claims, the IIED claims are not duplicative because enough elements of the IIED claims do not fall under

any of the plaintiffs' other tort causes of action. Indeed, the elicitation of allegedly false statements by Hall and Chavers and the fact that this happened after Melvin had been shot and while he was dying in a hospital are elements not covered by the tort of false imprisonment; while some of Hall's and Chaver's alleged conduct "falls within the ambit of traditional tort liability," some of their alleged conduct exceeds the ambit of traditional false imprisonment and falls solely within the ambit of IIED. See also Wahhab v. City of New York, No. 02 Civ. 0851, 2005 WL 323716, at *14 (S.D.N.Y. Feb. 10, 2005) (denying the defendants' motion for summary judgment on the plaintiffs' IIED cause of action because the claim was not wholly duplicative of claims for assault and battery).

## D.

The defendants also argue that their motion for summary judgment should be granted because the plaintiffs have failed to produce any medical evidence of their emotional injury. Although in some cases, lack of medical evidence was held to be a sufficient ground for granting a motion for summary judgment, courts have also held that medical evidence is not a prerequisite to IIED claims. Compare Singh v. U.S. Security Associates, Inc., No. 03 Civ. 2059, 2005 WL 236511, at *14

(S.D.N.Y. Feb. 1, 2005) (medical evidence was necessary), and Walentas v. Johnes, 683 N.Y.S.2d 56, 58 (App. Div. 1999) (same), with Fusco v. Cohen, No. 92 Civ. 1525, 1997 WL 473061, at *1 (N.D.N.Y. Aug. 7, 1997) (no medical evidence necessary where plaintiff provides evidence of emotional distress), and Massaro v. O'Shea Funeral Home, Inc., 738 N.Y.S.2d 384, 386 (App. Div. 2002) (no medical evidence necessary where special circumstances guarantee claim is not spurious). In some cases, the allegations are such that severe emotional distress requires no medical evidence. See, e.g., Massaro, 738 N.Y.S.2d at 386. In this case, William and Kimberly, after witnessing the shooting of their father, were allegedly falsely detained, prevented from seeing their dying father, and forced to make false statements. These allegations give rise to a sufficient likelihood that the plaintiffs suffered severe emotional distress and "'serve[] as a guarantee that the claim is not spurious.'" Massaro, 738 N.Y.S.2d at 386 (internal citation and quotation omitted).

Moreover, in their sur-reply, the plaintiffs provided medical records evidencing the plaintiffs' emotional state after the shootings. These records are sufficient for a reasonable jury to find that the third and fourth elements of IIED are satisfied. (See Bates Nos. Dudley001-23, attached to Pls' Sur-Reply Mem. of Law in Partial Opposition to Defs'

Mot. for Summ. Judgment, dated Mar. 17, 2005).  Accordingly, the defendants' motion for summary judgment cannot be granted on the grounds that the plaintiffs failed to provide medical evidence.

As explained above, the defendants' motion for summary judgment dismissing the IIED claims of William and Kimberly against Hall and Chavers is denied.  On the other hand, the defendants' motion for summary judgment on William and Kimberly's IIED claims against Campbell and Quilty and the defendants' motion for summary judgment on Deborah's IIED claims are granted.  Moreover, the defendants' motion for summary judgment dismissing the plaintiffs' IIED claims against Donnelly, O'Looney, Burke, and the City is granted.


## VI.

The defendants move for summary judgment on Kimberly's and William's claims for negligent infliction of emotional distress ("NIED") against the City and Donnelly (Ninth and Sixteenth Causes of Action, respectively).  The defendants argue that, under New York law, Kimberly cannot establish that she was threatened with physical harm because Donnelly never pointed his gun at her.  They also argue that William did not make a claim based on his fear to his safety and that neither plaintiffs can prevail on an NIED theory because Donnelly's

actions were intentional.  The plaintiffs counter that there
is evidence that Donnelly pointed his gun at Kimberly and that
she was frightened during the shooting.  Moreover, they assert
that William is making a claim for his fear based on
Donnelly's pointing a gun at him.

Under New York law, the "zone of danger" rule provides
that:

> where a defendant negligently exposes a plaintiff to an
> unreasonable risk of bodily injury or death, the
> plaintiff may recover, as a proper element of his or her
> damages, damages for injuries suffered in consequence of
> the observation of the serious injury or death of a
> member of his or her immediate family--assuming, of
> course, that it is established that the defendant's
> conduct was a substantial factor bringing about such
> injury or death.

Bovsun v. Sanperi, 461 N.E.2d 843, 848 (N.Y. 1984); see also
Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996)
(relying on Bovsun).  The zone of danger theory has been
applied in cases involving shootings by police officers.  For
example in Lubecki v. City of New York, the court upheld an
award for NIED by the decedent's brother because he was in the
"zone of danger" and witnessed police officers shooting his
sister.  Lubecki v. City of New York, 758 N.Y.S.2d 610, 614-
15, 618, 620 (App. Div. 2003).
In this case, the evidence indicates that both Kimberly
and William observed the shooting of their father, and it is
undisputed that Donnelly pointed his gun at William.  There
are questions of fact as to whether Donnelly pointed his gun
in the direction of Kimberly.  Although the defendants rely on
Kimberly's post-shooting concession that Donnelly never did
point his gun at her, part of her claim is that those were
false statements elicited from her by the defendants, and
there are issues of fact whether this statement was accurate.
Accordingly, summary judgment cannot be granted on these
claims.
The defendants also argue that, because Donnelly
intentionally shot Melvin, no NIED claim can result from the

shooting.  This argument confuses the nature of the shooting;[7] although a jury could find that Donnelly intentionally shot Melvin, this does not preclude actions by bystanders based on negligence toward them.  See Maney, 477 N.Y.S.2d at 438 (noting that a cause of action may lie for unintended harm resulting from injuries inflicted intentionally upon another (citing Bovsun, 61 N.Y.2d at 230-31)).

Accordingly, the defendants' motion for summary judgment dismissing William's and Kimberly's NIED causes of action is denied.

## VII.

The defendants move for summary judgment on the plaintiffs' Twenty-Eighth Cause of Action.  In the SAC, the Twenty-Eighth Cause of Action appears to state only a Monell claim.  Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978).  However, although the plaintiffs, in their memorandum of law, dropped all of their Monell claims, they also argued that in their Twenty-Eighth Cause of Action they stated a conspiracy claim under 42 U.S.C. § 1983.  The defendants responded that the plaintiffs have failed to offer any evidence of such a conspiracy.

The SAC does not state a conspiracy claim under § 1983; it only states a Monell claim which the plaintiffs have now disavowed.  Indeed, in the Twenty-Eighth Cause of Action in the SAC, the plaintiffs allege that "pursuant to an official municipal policy or custom of the City," all of the defendants were involved in a cover up, inaccurate portrayal of Melvin and of the shooting, and that these actions were meant to exculpate the defendants from criminal and civil liability. (SAC ¶ 151.)  Accordingly, the Twenty-Eighth Cause of Action in the SAC describes only a Monell claim based on the policy and did not state a separate cover-up claim under § 1983.  In any event, even a conspiracy claim under § 1983 must be dismissed.

A conspiracy claim under 42 U.S.C. § 1983 requires the plaintiff to show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. Ciambriello v. County of Nassau, 292 F.3d 307, 324-25 (2d Cir.

---

[7] The case relied on by the defendants, Wilson v. Diocese of New York, No. 96 Civ. 2400, 1998 WL 82921 (S.D.N.Y. Feb. 26, 1998), can be distinguished.  In Wilson, the plaintiff asserted both NIED and intentional torts for acts of the defendant toward the same plaintiff. Wilson, 1998 WL 82921, at *6.  Here, however, the plaintiffs claim intentional contact toward Melvin which negligently inflicted emotional distress on William and Kimberly.

2002); <u>Kramer v. City of New York</u>, No. 04 Civ. 106, 2004 WL 2429811, *7 (S.D.N.Y. Nov. 1, 2004).  The Court of Appeals for the Second Circuit has also stated that "complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." <u>Ciambriello</u>, 292 F.3d at 325.  Moreover, although such claims "are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence … [c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." <u>Kramer</u>, 2004 WL 2429811 at *7 (internal citation and quotation marks omitted).

In this case, the plaintiffs have failed to present evidence regarding the existence of an agreement to violate their constitutional rights.  Indeed, although the plaintiffs make a number of allegations that the defendants lied, forcibly took some of the plaintiffs to the 32nd precinct, and elicited false statements from some of the plaintiffs, they fail to present any evidence of an agreement.

More importantly, the plaintiffs fail to explain how the injuries from the alleged cover-up are different from those resulting from the alleged underlying constitutional violations or how the alleged conspiracy resulted in a lost remedy.  In <u>Paige v. City of Schenectady</u>, the Court of Appeals for the Second Circuit found that "the alleged police conspiracy had no significant effect upon [the plaintiff's] ability to bring her cause of action . . . ." <u>Paige v. City of Schenectady</u>, 264 F.3d 197, 200 (2d Cir. 2001); <u>see also</u> <u>Christopher v. Harbury</u>, 536 U.S. 403, 414 (2002) (noting that, for backward-looking claims, plaintiffs are required to show that they previously possessed a claim that cannot be litigated--or could have produced a remedy later unobtainable--because of the alleged cover-up); <u>Small v. City of New York</u>, 274 F. Supp. 2d 271, 278-79 (E.D.N.Y. 2003).  In this case, however, the plaintiffs fail to point to a lost claim or remedy resulting from the alleged cover-up, and the injuries from the cover-up appear no different than those stated in the plaintiffs' other claims.

Accordingly, the defendants' motion to dismiss the plaintiff's Twenty-Eighth Cause of Action is granted.

## VIII.

The defendants move for summary judgment dismissing the Twenty-Fourth Cause of Action, which, as amended, is asserted

by Deborah Sylvester against Chavers alleging that he falsely imprisoned her and thereby violated her constitutional rights and violated 42 U.S.C. § 1983. Defendants argue that Chavers never participated in the alleged false imprisonment of Deborah, and that she conceded as much during her deposition. The plaintiffs did not to respond to the defendants' arguments.

Although the plaintiffs assert that Chavers ignored at least six of Deborah's requests to go to the hospital; the record and Deborah's testimony at her deposition does not support that assertion. First, during his deposition, Chavers testified that he terminated his interview upon her request to go to the hospital and that he did not interact with Deborah beyond his brief interview. Second, there is no evidence in the record that he was involved in the alleged process of bringing her to the 32nd precinct or of keeping her there. Third, Deborah testified during her deposition that she had no recollection of being interviewed by Chavers and that the detective who ignored her requests to go to the hospital was Caucasian--Chavers is African-American.

Accordingly, Deborah's own admissions are that an officer who could not have been Chavers allegedly falsely imprisoned her. Because the plaintiffs fail to respond to the defendants' arguments and to offer any evidence from which a reasonable juror could conclude that Chavers falsely imprisoned Deborah, the defendants' motion for summary judgment dismissing the remaining claim of the plaintiffs' Twenty-Fourth Cause of Action is granted.

**IX.**

The individual defendants conclusorily oppose all of the plaintiffs' causes of action against them on the grounds of qualified immunity. They claim that the plaintiffs failed to demonstrate that the defendants' conduct was performed outside of their discretionary function or in intentional violation of the plaintiffs' established rights. The plaintiffs counter that qualified immunity is an affirmative defense, and that the burden is on the individual defendants to show that they are entitled to qualified immunity on each of the remaining causes of action against each of them. The defendants have not even attempted to do so.

Under the federal doctrine of qualified immunity, government officials may be protected from suits against them in their individual capacity. As articulated in by the Second Circuit Court of Appeals in <u>McCullough</u>:

> A government agent enjoys qualified immunity when
> he or she performs discretionary functions if

either (1) the conduct did not violate clearly established rights of which a reasonable person would have known, or (2) it was objectively reasonable to believe that the conduct did not violate clearly established rights.  A right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what he or she is doing violates that right.  The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct.  The unlawfulness must be apparent.

McCullough v. Wyandanch Union Free Sch. Dist., 187 F.3d 272, 278 (2d Cir. 1999); see also Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998).

Defendants have the burden of raising and establishing the affirmative defense of qualified immunity, at trial or on a motion for summary judgment.  In re State Police Litig., 88 F.3d 111, 123 (2d Cir. 1996) (citing Gomez v. Toledo, 446 U.S. 635, 640 (1980)).  Moreover, on a motion for summary judgment, if there are factual issues as to the reasonableness of the defendants' actions, the defendants are not entitled to summary judgment on a defense of qualified immunity.  Curry v. City of Syracuse, 316 F.3d 324, 334-35 (2d Cir. 2003) (reversing a district court's grant of summary judgment on the basis of qualified immunity because there were issues of material fact regarding the defendants' reasonable belief that their use of force was not excessive); Kerman v. City of New York, 261 F.3d 229, 240 (2d Cir. 2001) ("[s]ummary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness") (internal citation omitted).

In this case, the defendants fail to explain for which claims they are raising a defense of qualified immunity.  They also fail to explain whether qualified immunity applies to claims for which they do not seek summary judgment.  Moreover, they fail to explain why, for each claim, the actions of the defendants were such that reasonable officials could disagree as to whether they violated clearly established rights.  Indeed, the defendants provide no explanations--whether based on the record or mere allegations--for the officers' conduct.  Accordingly, the defendants fail to carry their burden on the affirmative defense of qualified immunity, and their

conclusory motion for summary judgment on this ground is denied.

Eleventh Cause of Action against the City of New York and
Hall and the parts of the Twelfth Cause of Action against
Hall; (3) the parts of the Eighteenth Cause of Action against
the City of New York, Quilty, Campbell, and Chavers and the
parts of the Nineteenth Cause of Action against Quilty,
Campbell, and Chavers; (4) the parts of the Fifteenth and
Twenty-Second Causes of Action against Hall and Chavers; (5)
the Ninth and Sixteenth Causes of Action.

**SO ORDERED.**

**Dated:**     **New York, New York**
            **September 6, 2005**

                             **John G. Koeltl**
                       **United States District Judge**